IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C. DOV SACKS<br><br>        Plaintiff,<br><br>    vs.<br><br>DJA AUTOMOTIVE LLC d/b/a<br>KIA OF WEST CHESTER<br>        Defendant. | CIVIL ACTION<br><br><br><br><br><br><br>NO.   12-284(TON) |

**PLAINTIFF'S SUPPLEMENTAL RESPONSE IN**

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

CARY L. FLITTER
THEODORE E. LORENZ
ANDREW M. MILZ
Attorneys for Plaintiff

FLITER LORENZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
610-822-0782

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    INTRODUCTION ............................................................................................... 1

II.   RELEVANT FACTS & PROCEDURAL HISTORY ....................................... 2

III.  LEGAL ARGUMENT ...................................................................................... 11

  A.   Defendant Violated the Federal and State Odometer Act Disclosure Requirements ........ 11

     1.   Facts Demonstrate Rollback and Discrepancy ............................................. 13

     2.   DJA had the Requisite Intent to Defraud; Reliance on the Prior Title and Auction Documents Was Not Reasonable ....................................... 15

     3.   The Statement of "No Discrepancy" was False ........................................... 17

  B.   The CarFax Reports are Not Hearsay ....................................................... 19

     1.   The CarFaxes are Not Hearsay Because They are Not Offered for the Truth .............. 19

     2.   CarFaxes are Public Records within Market Compilations or Commercial Publications ........................................................................ 20

  C.   The Facts Support Plaintiff's Consumer Protection Law Claim ....................... 22

  D.   Breach of Warranty .................................................................................. 24

  E.   Defendant Waived its Right to Arbitrate .................................................. 25

IV.   CONCLUSION ................................................................................................. 26

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C. DOV SACKS<br><br>                   Plaintiff,<br><br>    vs.<br><br>DJA AUTOMOTIVE LLC d/b/a<br>KIA OF WEST CHESTER<br>                  Defendant. | CIVIL ACTION<br><br><br><br><br><br><br><br>NO.   12-284(TON) |

**PLAINTIFF'S  SUPPLEMENTAL RESPONSE
IN OPPOSITION TO DEFENDANT'S  MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendant DJA Automotive, LLC (which does business as Kia of West Chester) heavily advertises used cars on the internet with a "CarFax" logo, a widely advertised and popular vehicle history report that discloses accident, title and odometer history to the consumer.  But when Plaintiff Dov Sacks was purchasing his "certified" used Kia from Defendant, the dealer concealed the CarFax from him – because the CarFax revealed a major odometer discrepancy. Federal and state odometer tampering laws require that the dealer state under oath whether there is any evidence of – not only a rollback, but – any "odometer discrepancy."  In this way, the consumer can investigate, or decide they want to choose another car.

Nonetheless, Defendant failed to check off "odometer discrepancy" on the federal form. Discovery has conclusively established that Defendant knew of a discrepancy – indeed one so severe that it took the dealer over a year to even obtain a car title from PennDOT.  During this entire year, in the year following, and for months into this lawsuit, Defendant lied to Sacks about the odometer problem, denying that they knew of any odometer discrepancy.  After this suit was filed, Defendant continued to swear that they were themselves victims, unaware of any odometer

problem.  Defendant even went so far as to enlist this Court's aid with an emergency motion to block a critical deposition of the CarFax company – a request this Court denied.

Then the Defendant's web of deception unraveled.  The CarFax deposition revealed (contrary to Defendant's repeated assertions of ignorance) that Defendant positively knew of the severe odometer discrepancy, and that PennDOT records showing up to 59,000 miles on the "Low Miles" car Defendant sold to Sacks showing only 33,600.  Defendant positively knew because mid-case they have been forced to concede that Defendant obtained <u>two</u> CarFax reports: one right after they bought the car for resale, and another on the day they found a buyer, Mr. Sacks.  These key reports – that Defendant tries mightily to suppress here (but which do not even constitute hearsay) reveal actual knowledge, and an intent to swindle and cover up.  Plaintiff sues for rescission and other relief.

## II.   <u>RELEVANT FACTS & PROCEDURAL HISTORY</u>

### *Sale of the Optima to Sacks*

1.     Defendant auto dealer DJA Automotive d/b/a Kia of West Chester ("DJA") ran an internet advertisement for a used 2004 Kia Optima with a vehicle identification number ("vin") ending in 4373, claiming the Optima had 33,600 miles, touting its "LOW Miles!!", and calling it a "Certified" used car. (See Ex. A, Complaint at Ex. A thereto, advertisement; Ex. "B", dep. of Doc Sacks at p. 11-12).

2.     On January 7, 2009, Plaintiff Dov Sacks visited DJA after seeing the on-line advertisement for the Optima.  (Id.).  DJA's salesperson, Karen Wotasek Halloran, remarked many times on the "low mileage" selling point.  (Id. at p. 14-16, 23-24).

3.      Prior to Sacks's visit, he and Halloran had email conversations at which point Sacks indicated his preference for a low mileage vehicle. (Id.; see also Ex. "C", dep. of Halloran at p. 59-63, and Exhibit "Halloran 3" thereto, emails).

4.      Sacks purchased the 2004 Optima over a 2006 model with more miles because of DJA's representations that 2004 Optima was a certified, "low mileage" car. (Ex. "B", Sacks dep. at p. 23-24).

5.      DJA represented on an odometer disclosure form that the vehicle had 33,600 miles, leaving the box labeled "**WARNING! ODOMETER DISCREPANCY**" unchecked. (See Ex. "A", Complaint at Ex. B thereto, Odometer Disclosure; Ex. "D", dep. of Thomas Walsh, sales manager, at p. 27).

6.      Despite buying the car on January 7, 2009, Plaintiff did not receive title or registration for over a year and drove without these important documents until January 2010, at great risk. (Ex. "B", Sacks dep. at 24-27, 33-36). During this time, DJA repeatedly told Sacks that the delay was the result of a "typo." (Id.). In reality, DJA attempted to obtain dealer title to the Optima in its name, but was repeatedly rejected by PennDOT.

*The Optima's Haunted Title History*

7.      DJA purchased the Optima at auction on December 5, 2008. At that time, a Virginia certificate of title reading "33,598" miles was provided by the seller to DJA. (See Ex. "J" and Ex. 23 to Doc. No. 24-1, Def's supp. br. in support of MSJ).

8.      The auction seller was a subprime auto finance company called Flagship Credit Corporation. (Id.). According to DJA's owner, Jim Sipala, the fact that the finance company was selling the car can indicate that the vehicle was previously repossessed. (See Ex. "E", Sipala dep. at 64-66).

3

9.      Notwithstanding what was on the Virginia title, at the time of DJA's purchase of the Optima in December 2008, PennDOT's certified records[1] contained, and <u>still contain to this day</u>, *inter alia,* the following records:

    a.   A certified MV-1 form reflecting a mileage of 55,787 dated Mar. 18, 2005 (See Ex. "F");

    b.   A certificate of title reflecting 55,987 dated Mar. 27, 2006 (Ex. "G");

    c.   A certificate of title reflecting 56,009 dated May 1, 2006 (Ex. "H:); and

    d.   A certified assignment of title reflecting 59,007 dated August 8, 2006 (Ex. "I")..

10.     Prior to listing the Optima for sale or selling it to Sacks, DJA sent a form MV-1 dated December 16, 2008 to PennDOT to obtain title in its name at 33,609 miles. (Ex. "K", DJA 000132).

11.     According to DJA's title clerk, Jennifer Mimm, PennDOT rejected the MV-1. (Ex. "L", dep. tr. of Jennifer Mimm at p. 24-25).

12.     After selling the car to Sacks, DJA's title submissions continued to be rejected. PennDOT sent a letter dated February 6, 2009 indicating that "the application could not be processed" as "THERE IS EVIDENCE OF A DISCREPANCY OR ALTERATION IN THE DISCLOSURE OF THE MILEAGE READING FOR THIS VEHICLE."   (See Ex. "M", PennDOT certified copy of Feb. 6, 2009 letter).  PennDOT sent DJA a similarly worded letter dated March 4, 2009.  (See Ex. "N", DJA 000129-30).

---

[1]      Photocopies of these certified records are, as indicated below, attached as Exs. "F" through "I".  As set forth in the attached Certification of Andrew Milz, Esq., attached hereto as Ex. "O", counsel has in his possession original certified public records from PennDOT, complete with raised seal, which can be made available to the Court upon request.

13.     After these rejections, DJA sent another form MV-1 to PennDOT dated October 22, 2009.  (Ex. "P", DJA000135).  DJA stated on the MV-1 that the odometer reading on the Optima was "33,600" and completed a check-box admitting that this figure:

> IS **NOT** THE ACTUAL MILEAGE
> **WARNING**: ODOMETER
> DISCREPANCY

(Id.).  DJA's title clerk Mimm signed this MV-1 on behalf of DJA which reflects it was witnessed by her supervisor Thomas Walsh, the sales manager. (Id.; see also Ex. "P", DJA000135).

14.     The October 22, 2008 MV-1 further read:

> WARNING:   FEDERAL AND STATE LAWS REQUIRE THAT YOU STATE THE MILEAGE IN CONNECTION WITH THE TRANSFER OF OWNERSHIP.  FAILURE TO COMPLETE OR PROVIDING A FALSE STATEMENT MAY RESULT IN FINES AND/OR IMPRISONMENT.

Prior to submitting it to PennDOT, Mimm and Walsh signed this document directly below the statement: "I/WE CERTIFY THAT ALL STATEMENTS HEREIN ARE TRUE AND CORRECT…" (Id.).

15.     At his deposition, Sales Manager Thomas Walsh acknowledged that the October 22, 2009 MV-1 represented a statement of Kia of West Chester, and when asked if he authorized the representation "to PennDOT that 33,600 miles was not the actual mileage on this vehicle?" he responded "Yes." (Ex. "D", Walsh dep. at p. 44-45).

***DJA's Suppression of Negative CarFax Reports is Revealed***

16.     In Summer 2011, Sacks decided to sell the Optima, and on June 29, 2011 he obtained for the first time a CarFax vehicle history report.  To his surprise, the CarFax stated "Potential Odometer Rollback" and that there were earlier titles reflecting mileage over 55,000

miles, prior to the sale of the car to him on January 7, 2009.  (Ex. "B", Sacks dep. p. 27-28; Ex. A, Compl. at Ex. D thereto).

17.     Plaintiff filed a Complaint (Doc. No. 1, also Ex. "A" hereto) in this Court on January 17, 2012 alleging violations of the Federal Motor Vehicle Information and Cost Savings Act, 49 U.S.C. § 32701et seq. (*i.e.*, the "Federal Odometer Act"), and state law.  Plaintiff alleges *inter alia* that DJA misrepresented that the car it sold him had "low" 33,609 miles, despite knowing that the subject vehicle had a history of odometer discrepancy reflecting earlier titles of more than 55,000 miles.

18.     Plaintiff alleged DJA ran a "Carfax or similar title history on the Optima vehicle" prior to selling it to Mr. Sacks on January 7, 2009.  (Id. at ¶16).  Defendant filed its Answer on February 29, 2012, denying this key allegation. (Doc. No. 6 at ¶ 16).   Defendant would later recant.

19.     Later, in response to a supplemental document request from Plaintiff which asked for "All Carfaxes obtained on the Sacks car at any time," Defendant responded by pointing only to a lone CarFax vehicle history report dated May 27, 2009 (five months after the sale), which it produced with its Initial Disclosures. (See Ex. "Q" hereto, Def. Answ. to Supp. Doc Req dated June 11, 2012 and May 27, 2009 CarFax report, DJA 000003-6).

20.     Defendant's corporate designee, Dondra Discala expressed ignorance as to whether a CarFax was pulled on Mr. Sacks' vehicle before selling it to him.   (See Ex. "R", Discala dep. dated April 30, 2012 at p. 64).

21.     The owner of the dealership, Jim Sipala, claimed in deposition he did not know when CarFaxes were pulled on the Sacks vehicle. (See Ex. "E", Sipala dep. dated June 21, 2012 at p. 21).  When asked "[t]o your knowledge did DJA Automotive have any documents in its

possession at this point showing that there was an odometer discrepancy on this vehicle?", the owner Mr. Sipala answered "No." (Id. at 82-83, objection omitted).  This was false.

22.    Plaintiff then noticed the deposition of CarFax, Inc. on June 13, 2012, to determine just when and on what dates, if any, CarFax vehicle history reports were indeed requested by DJA.  Incredibly, DJA responded by filing an emergency Motion to Quash the CarFax Deposition Subpoena (Doc. No. 13).  After briefing and (telephonic) argument, the Court deemed the CarFax, Inc. deposition relevant, and denied Defendant's emergency motion. (Doc. No. 16).

23.    On July 10, 2012, Plaintiff took the deposition of Vincent Luckey, the designated representative of Carfax, Inc.  (Mr. Luckey's deposition transcript is appended, in its entirety with Exs. 3-10 thereto, as Ex. "S").

24.    Mr. Luckey confirmed that DJA indeed obtained two CarFax vehicle history reports prior to selling the car to Mr. Sacks.  The first was obtained by DJA on December 9, 2008, nearly one month before selling the car to Mr. Sacks. (See Ex. "S", Luckey dep. dated July 10, 2012 at p. 18-22)  Mr. Luckey also testified that on January 7, 2009, the very day the vehicle was sold to Mr. Sacks, the account belonging to DJA accessed yet another CarFax vehicle history report on the car, a mere hours before Mr. Sacks' appointment with the dealership to buy the car. (Id.). [2]

25.    According to CarFax, Inc. both of the vehicle history reports pulled by DJA before sale reflected the discrepant mileage as well as an "odometer discrepancy data flag." (Id.). According to Mr. Luckey, the "odometer discrepancy data flag" was present because the 33,598

_____

[2]    Mr. Luckey testified that CarFax cannot replicate those vehicle history reports obtained by DJA on December 9, 2008 and January 7, 2009.  (Ex. S, Luckey dep. at 12-22).  However, it can and did determine what those reports said.  (Id.).  While Plaintiff has asked DJA for copies of all CarFax reports it pulled, copies of the two pre-dating the sale have never been provided.  Plaintiff presumes they were lost or destroyed by DJA.

miles reflected on the car's Virginia certificate of title was lower than the earlier certified titles in

PennDOT's records. (Id. at 49-61). See also id. at Exhibit "Luckey 3" thereto at CarFax 11-14,

vehicle history report reviewed by Luckey:





26.     Mr. Luckey also testified that a potential odometer rollback indicator on a CarFax report negatively affects a car's value. (Id. at 50).

***After the CarFax Deposition, DJA Recants***

27.     On August 2, 2012, Plaintiff deposed DJA's saleswoman Karen Halloran.   No doubt informed with the events of the CarFax deposition, Halloran admitted (contrary to DJA''s prior position in the case) that DJA pulled a CarFax vehicle history report on the subject vehicle on January 7, 2009, the day she sold it to Sacks.  This report contained an odometer discrepancy data flag and reflected the higher-mileage titles in PennDOT's records.  (See Ex. "C", dep. of Karen Halloran at p. 16-23).

28.     In her deposition, Ms. Halloran went on to testify to the following regarding the odometer disclosure form (i.e., Ex. A at Ex. B thereto):

> Q:     But we do have an odometer discrepancy form [sic] that does not have a box checked for Warning odometer discrepancy; is that correct?
> ...
> A:     Yes, there was no box checked on these copies.
> Q:     Ma'am, is it your testimony today that you admit that you knew that the CarFax reflected an odometer discrepancy on January 7, 2009, the date that the car was sold to Mr. Sacks?
> A:     Yes.

(Id. at p. 62-63, objections and brief colloquy omitted).

29.     Despite DJA having obtained a CarFax, <u>no one from DJA told Plaintiff</u> – before or after sale – about the repo history, higher mileage or the odometer discrepancy.  (See Ex. "T", Certification of Dov Sacks dated Aug. 28, 2012, at ¶ 3-7).[3]   If DJA had told him, Sacks plainly would have moved on to another vehicle.  *Id.*

---

[3]     At her August 2, 2012 deposition, Halloran not only stated she obtained a CarFax at this time, but actually reviewed it (and the odometer discrepancies reflected therein) with Sacks prior to sale.  (Ex. "C", Halloran dep. at p. 15-16).  Sacks denies this, and looks forward to rebutting this preposterous claim that out of thousands of cars for sale, he would voluntarily buy one with a known odometer discrepancy.

*DJA's Reliance on CarFax Reports*

30.     DJA seeks to have the CarFax reports excluded from this case.  However, its own

regular use CarFax speaks to the vehicle history reports' reliability and acceptance in the auto

sales industry, and estops them.

31.     According to DJA's General Manager, Joe Spadaro, DJA is a CarFax subscriber

and pays a premium to be a "Carfax Advantage Dealer." (*See*  Ex. "U"*,* Dep. of Joseph A.

Spadaro, II, taken August 2, 2012 at p. 4-5).  "A Carfax Advantage Dealer is a dealer that

subscribes to an unlimited reports package" and gets other "perks," such as advantages in

pricing. (Ex. "S" Luckey dep. at 41).

32.     When asked if he thought consumers rely on Carfax in making decisions to buy

vehicles, Spadaro replied "I think it helps them."  Spadaro discussed the usefulness of the reports

and called CarFax a "brilliant idea." (Id. p. 1-9).

33.     Indeed, Defendant DJA's website demonstrates its own heavy reliance on CarFax

reports.  DJA prominently displays and promotes to the buying public, the CarFax logo on the

used     cars     it     sells     on     its     website.     (See     DJA     website,

http://www.kiaofwestchester.com/usedspecials.aspx, last visited October 18, 2012).  Even on the

CarFax website, CarFax refers to DJA as a "CarFax Advantage Dealer".  (CarFax website,

http://www.carfax.com/used_car_classifieds/dealer/inventory.cfx?dealer=496955,  last  visited  October  18,

2012).

34.     So important are these reports that Kia of West Chester ran 503 CarFax vehicle

history reports in 2009 and 611 in 2010.  (Luckey dep. at 44, Ex. "S").

35.     Plaintiff's expert, Richard Diklich has opined that the Optima could have traveled

over 55,000 miles in the period of 16 months, and that DJA's assumption "that a new vehicle

could not have that many miles on it is not adequate research into the issue of a mileage discrepancy. DJA management does not appear to have performed any meaningful research into the mileage and database warnings issue prior to the sale of the vehicle to Sacks." (Ex. X, Diklich report at p. 3).

36.     Diklich also states that vehicles with negative histories, including warnings of "possible rollback" or "mileage discrepancy" in public databases are not valued the same in the marketplace as cars with clean histories. (Id. at p. 4).

## III.   LEGAL ARGUMENT

DJA obtained two CarFaxes prior to selling the car to Sacks. These reports indicated "potential odometer rollback" and directed DJA to higher mileage titles in PennDOT's public records. Indeed, PennDOT's records still reflect this negative information, to Plaintiff's great detriment. DJA had knowledge of odometer rollback or (at the very least) odometer discrepancy, intentionally hid this information from Sacks, misrepresented that there was no discrepancy, then tried repeatedly (even throughout this litigation) to cover it up. Summary judgment must be denied.[4]

### A.   Defendant Violated the Federal and State Odometer Act Disclosure Requirements

The Federal and state Odometer Acts serve "the broad purpose ... to protect motor vehicle purchasers from inaccurate mileage representations from sellers." *Hughes v. Box*, 814 F.2d 498 (8th Cir. 1987). The Act is "remedial in nature, and should be broadly construed to

---

[4]     Plaintiff incorporates the well-known standard for summary judgment articulated in his opening brief (Doc. No. 10).

effectuate its purpose." *See Ryan v. Edwards*, 592 F.2d 756, 760 (4th Cir.1979).[5]  The operable

language of the Federal Odometer Act reads:

> (a)(1)  Disclosure requirements.--Under regulations prescribed by the Secretary of Transportation that include the way in which information is disclosed and retained under this section, a person transferring ownership of a motor vehicle shall give the transferee the following written disclosure:
>
> (A) Disclosure of the cumulative mileage registered on the odometer.
>
> (B) Disclosure that the actual mileage is unknown, if the transferor knows that the odometer reading is different from the number of miles the vehicle has actually traveled.
>
> (2) A person transferring ownership of a motor vehicle may not violate a regulation prescribed under this section _or_ give a false statement to the transferee in making the disclosure required by such a regulation.

49 U.S.C. § 32705(a)(2) (emphasis added); *see also* Pennsylvania's Odometer Statute, 75 Pa.

C.S. §7134(b)(1) ("No transferor shall violate any provision of this section _or_ give a false

statement to a transferee in making any disclosure required by this section").  Both Acts prohibit

an auto dealer from (1) odometer tampering _or_ (2) "giv[ing] a false statement to the transferee in

making the disclosure" of a vehicle's mileage.  (Id.)

   DJA provided Sacks with an odometer disclosure statement that listed the Optima's

mileage as "33,609".  DJA determined not to check the box advising "WARNING! ODOMETER

DISCREPANCY."  (Ex. "V", DJA 000062).  The record facts amply demonstrate that DJA knew

or should have known that the 33,609 figure was false or discrepant.  At the very least, it knew of

an odometer discrepancy, and thus its failure to indicate that on the disclosure was false.  In both

cases, DJA violated the federal and state acts in conjunction with disclosing the mileage of the

Optima.

---

[5]      The statute in many of the older cases discussed in this brief, 15 U.S.C. § 1989, was recodified in 1994 and amended in 1996 at 49 U.S.C. § 32701, affecting no substantive change in the law. *Lee v. Gallup Auto Sales, Inc.*,135 F.3d 1359, 1360 (10th Cir. 1998).

### 1. Facts Demonstrate Rollback and Discrepancy

Discovery has revealed ample record facts which tend to show that the odometer has been rolled back and that the actual mileage of the Optima was not 33,600 when sold to Sacks. Perhaps the most striking evidence of this is DJA's party admission on the October 22, 2009 MV-1 form that "33,600" was "**NOT** THE ACTUAL MILEAGE." (Ex. "P", emphasis in original). Title clerk Jennifer Mimm made this certified statement on behalf of DJA, apparently "subscribed and sworn" before sales manager Thomas Walsh, under pain of violation of federal and state law. (Id.). DJA then submitted this sworn statement to PennDOT. <u>This is the disclosure that should have been provided to Sacks in the first instance, but was not</u>. This party admission and contradiction in the evidence <u>alone</u> is sufficient to defeat summary judgment.

The record is replete with more damning facts, not the least of which are the public records, certified by PennDOT and thus self-authenticated. Fed. R. Ev. 901(b)(7); 803(8). These include the certificates of title and sworn MV-1s reflecting mileage in excess of 33,609 prior to sale of the Optima to Sacks – 55,787 (Mar. 18, 2005), 55,987 (Mar. 27, 2006), 56,009 (May 1, 2006) and 59,007 (Aug. 8, 2006). (See Exs. "F – I"). The certified public records also include the title rejection letters from PennDOT to DJA stating: "THERE IS EVIDENCE OF A DISCREPANCY OR ALTERATION IN THE DISCLOSURE OF THE MILEAGE READING FOR THIS VEHICLE." (See Ex. "M"). There are also the CarFax reports (discussed at length below) and testimony, which reflect the odometer discrepancy and Defendant's knowledge thereof prior to sale to Sacks.

While the Court does not weigh quantity or quality of evidence at this stage, the above record facts dwarf Defendant's speculative inferences premised on its laundry list of unauthenticated documents – many of which confirm rollback. (Def.'s supp. br. at 4-5). For

instance, the purported bill of sale at Exhibit 4 to defendant's motion and the MV-1 at Exhibit 5 both dated February 10, 2005 list the Optima's mileage at "55,787" (Doc. No. 24-1, at Ex. 4-5), and an apparent PennDOT rejection letter, similar to those sent to DJA (Exs. "M and N"), state that a previous seller was alerted to the "EVIDENCE OF A DISCREPANCY OR ALTERATION" as far back as August 2005 (Doc. No. 24-1 at Ex. 9).  The vast remainder of the documents attached by Defendant are unauthenticated in any way, and most are self-serving, unreliable documents apparently created by a representative of Kia – see e.g. Doc. No. 24-1 at Exhibits 1-3, 6, 8-11, 13-16, 18-21.   Documents that are not shown to be admissible at trial may not be used to support summary judgment.  *See* Fed. R. Civ. P. 56(c)(2) (summary judgment must be supported by admissible evidence).

Defendant's expert report does not change the landscape.  Mr. Allen's conclusion of no rollback is based largely on Kia generated documents and hearsay.  He shies away from PennDOT's certified titles and ignores the fact that title switched hands multiple times here where transferees from title to title swore to the higher mileage reading.  Mr. Allen belittles these sworn statements on odometer disclosures as "honest mistakes."  For all his speculation about what happened here, Mr. Allen has no explanation for why DJA withheld information about the potential rollback and mileage discrepancy from Sacks before, during and after sale.  DJA must know that its expert is subject to cross-examination at trial and its own expert report (where challenged, as here) cannot support summary judgment.  *See e.g. F.P. Woll & Co. v. Fifth and Mitchell St. Corp.*, 1999 WL 79059, *7 (E.D.Pa. Feb. 4, 1999).  There are clearly material facts in dispute and thus, summary judgment should be denied.

2.   **DJA had the Requisite Intent to Defraud; Reliance on the Prior Title and Auction Documents Was Not Reasonable**

"[C]onstructive knowledge [of an odometer's inaccuracy] is sufficient for civil liability" under the federal and state odometer acts. *Heffler v. Joe Bells Auto Serv.*, 946 F.Supp. 348, 351-52 (E.D.Pa.1996) (following *Nieto v. Pence*, 578 F.2d 640 (5th Cir.1978)). "[E]ven where a defendant lacks actual knowledge, the defendant 'may still be found to have intended to defraud and thus may be civilly liable for a failure to disclose that a vehicle's actual mileage is unknown.'" *Id.* (quoting *Nieto*). "Where a defendant could reasonably conclude, upon inspection of a vehicle, that the mileage on the odometer of the vehicle was incorrect, the defendant has a duty to inform the potential purchaser that the actual mileage of the vehicle is unknown." *Id. at* 352.

Despite the two CarFax reports pointing DJA to the higher mileage titles in PennDOT's records, DJA claims it had "no reasonable basis to believe the odometer reading was incorrect." (Def. supp. br. at 12). Whether its cavalier dismissal of the CarFaxes it obtained was "reasonable" is a quintessential jury question. However, the applicable case law indicates that alleged reliance on the Virginia Title, auction documents, and the odometer itself is **not** reasonable in light of the conflicting information available in the form of the CarFax reports and PennDOT's multiple higher-mileage records.

In the seminal case *Heffler v. Joe Bells Auto Serv.*, 946 F.Supp. 348 (E.D.Pa.1996), this court rejected DJA's very argument. There the vehicle was represented on the odometer disclosure as having 23,613 miles. Plaintiffs suspected odometer fraud where the car showed wear on the seats, and wrappers and litter were strewn about the car. After sale, they were advised by NHTSA that there was a rollback. *Heffler*, 946 F. Supp. at 349. They then sued the dealer under the federal and state acts. The dealer moved for summary judgment claiming

plaintiffs could not prove the requisite "reckless disregard for the truth" because the dealer "had no knowledge, or reason to know, of the previous odometer rollback by" a prior transferee who had provided it with a false odometer certificate, which it then used to prepare the odometer disclosure given to the plaintiffs. *Id. at* 350.   The court flatly rejected the dealer's argument, holding that the defendant dealer had an independent duty to "adopt practices reasonably designed to uncover incorrect odometer readings." *Id. at* 352.   Because the condition of the car in *Heffler* was uncharacteristic of one with the mileage as stated on the previous title, the defendant dealership had a duty to advise the Hefflers that the actual mileage was unknown. *Id. at* 353.

The facts are more compelling here.   The December 9, 2008 CarFax pulled a month before sale to Sacks and the January 7, 2009 CarFax pulled the day of sale both clearly announced: "potential odometer rollback." (See Ex. "S", Luckey dep. at p. 49-57; Ex. "C", Halloran dep. at p. 18-20). Both listed the earlier titles in PennDOT's records. (*Id.*).   While constructive knowledge is all that is required under the Acts, this is <u>actual</u> knowledge – if not of rollback in fact, then of an actual *discrepancy*.   Plaintiff cannot think of a more overt statement that there was a problem with the mileage disclosures on this vehicle. Despite this, as Plaintiff's expert Mr. Diklich observes, "DJA management does not appear to have performed any meaningful research into the mileage and database warnings issue prior to the sale of the vehicle to Sacks." (Ex. X, Diklich report at p. 3).

Other courts, like *Heffler,* have held that a dealer's failure to take any steps to independently verify the accuracy of an odometer reading constitutes reckless disregard for purposes of the Act.   "To hold otherwise would strip the Odometer Act of any meaning." *Suitor v. Mitchell Motor Coach Sales, Inc.*, 151 F.3d 1275, 1284 (10th Cir. 1998); *Terry v. Whitlock*,

102 F.Supp.2d 661 (W.D.Va. 2000); *Aldridge v. Billips*, 656 F.Supp. 975, 978-79 (W.D.Va.1987) ("Mere reliance on the odometer reading, in the face of other readily ascertainable information from the title and the condition of the truck constitutes a reckless disregard that rises to the level of intent to defraud, as a matter of law."). A transferor who has reason to know that the odometer reading is inaccurate cannot "clos[e] his eyes to the truth." *Suiter*, 151 F.3d at 1282 (quotation marks and citations omitted).

DJA had actual knowledge of a discrepant odometer reading but chose to conceal its knowledge from Sacks, and affirmatively misrepresent no discrepancy, in violation of the Acts. In light of this, it cannot hide behind the sketchy lower-mileage Virginia title,[6] nor any out of court statements allegedly made at the auto auction about mileage or the odometer itself. *Heffler at* 353-53.

### 3. The Statement of "No Discrepancy" was False

As stated above, Federal and state Odometer Acts prohibit an auto dealer from odometer tampering **or** "giv[ing] a false statement to the transferee in making the disclosure" of a vehicle's mileage. 49 U.S.C. § 32705(a)(2); 75 Pa. C.S. §7134(b)(1). Regardless of whether there was a rollback in fact (and there is ample evidence that there was), DJA is still liable for its false statement in failing to check the box for "ODOMETER DISCREPANCY" if it had conflicting evidence of what the mileage on the car in fact was. The provisions of the Odometer Act do not require actual knowledge that the odometer reading is wrong. *See Commw. v. Colonial Motor*

---

[6]        DJA's reliance on these documents is even more unreasonable in light of Jim Sipala's acknowledgment that finance company sellers indicate the vehicle was a repo. (Ex. "E" at 64-66). Finance companies who sell repossessed vehicles at post-repo, dealer only auctions are notorious for "making no efforts to determine the accuracy of cars' odometer readings." *See* National Consumer Law Center, Automobile Fraud at 5.8.9 (4th ed. 2011). Motivated by obvious financial incentive, "these creditors typically disclose the odometer reading as accurate even though they have no direct knowledge of whether that is in fact the case." *Id.* Here, it appears that prior transferee Flagship (which has since gone out of business) obtained Virginia title at 33,598 despite the long history of higher-mileage PA titles and other indicia of rollback it might have had.

*Sales, Inc.*, 420 N.E. 2d 20, 25 (Mass. Ct. App. 1981) ("Confronted with conflicting evidence as to what the mileage on the car in fact was, Colonial was not entitled to choose the lower mileage for purposes of its certification"); *Nieto v. Pence*, 578 F.2d 640, 642 (5th Cir. 1978).

Here, DJA clearly had conflicting evidence as to the car's mileage – *i.e.*, in the form of the CarFax reports pointing to the earlier higher-mileage titles in PennDOT's records. It had a duty to disclose that mileage was uncertain. *Colonial Motor Sales, Inc.*, 420 N.E. 2d at 25; *Heffler*, 946 F. Supp. at 352 (quoting *Nieto*) ("the defendant 'may still be found to have intended to defraud and thus may be civilly liable for a failure to disclose that a vehicle's actual mileage is unknown.'"). Instead, by not checking the warning box and by concealing the conflicting data from Mr. Sacks, DJA falsely represented there was no odometer discrepancy. It conveniently chose the lower, more appealing mileage amount, concealing the truth in the effort to make a sale.

Defendant cites *Francesconi v. Kardon Chevrolet, Inc.*, 888 F.2d 18, 20 (3d Cir. 1989) for the proposition that the Act's tampering prohibitions are not violated unless the odometer has undergone a "change". (Def. br. 10). This is certainly true for the tampering prohibitions, but that case, *Heffler, Nieto, Colonial Motors* and others also recognize that a misrepresentation can violate the Acts. In *Franscesconi* the circuit court went on to analyze the misrepresentation claim, finding that (unlike here) there was no evidence of rollback, there was no knowledge of a mileage discrepancy, and the statement on the disclosure was accurate. *Francesconi*, 888 F.2d at 20. Here, there was evidence of rollback and inaccuracy, and (at the very least) knowledge of the discrepancy. DJA's false statement that there was no discrepancy violates the Acts.

## B.   **The CarFax Reports are Not Hearsay**

DJA argues that CarFax reports are inadmissible hearsay within hearsay.  (Def. supp. br. at 10-11).  It is mistaken.

### 1.   **The CarFaxes are Not Hearsay Because They are Not Offered for the Truth**

Plaintiff does not here offer the CarFaxes for the truth that there was an actual rollback, but for purposes of showing a discrepancy and DJA's knowledge of the odometer discrepancies at issue in this case.  DJA's knowledge is an integral element of Plaintiff's fraud claims, and the CarFaxes have independent relevance as to what DJA knew of the odometer discrepancies, and when (i.e. before sale to Sacks).  Whether the CarFaxes are true or not, or accurate or not, has no bearing on that inquiry.  Similarly, the truth or accuracy of the CarFax reports does not change the fact that the presence of "potential odometer discrepancy" and the listing of higher-mileage titles has materially diminished the value of the Optima, causing Sacks damage.  (See discussion below).  The CarFax reports are not offered for the truth of rollback, but for their independent relevance in proving knowledge and damages that arise by a car being labeled with a CarFax rollback flag.

Defendant's constant refrain that the CarFax reports in this case are "incorrect" is itself incorrect, but in any case reflects a misunderstanding of the nature of CarFax reports.  (Def. br. 11). As amply demonstrated by comparing the certified PennDOT records with the CarFaxes at issue in this case, one can see that the CarFax vehicle history reports accurately mirror PennDOT's records.  (*Compare* Exs. "F"–"I" with, *e.g.*, Exs. A-D, or S-3 at CarFax 11-14). The CarFax reports are accurate and doing exactly what they are supposed to do.  A comparison with a CarFax competitor, AutoCheck, reveals the same listing of higher-mileage titles and potential rollback.  (See Ex. "W", AutoCheck vehicle history report dated June 15, 2012).  It is

the presence of these higher titles in PennDOT's records – not the mirror of them found in CarFax or AutoCheck – that <u>create the haunted history for this vehicle</u>, cause a diminution in value, and warrant the rescission of the deal that Mr. Sacks seeks.

### 2. CarFaxes are Public Records within Market Compilations or Commercial Publications

Apart from their probative value regardless of the "truth" of the report – even if the CarFax reports are hearsay within hearsay, the reports constitute an exception within an exception and are thus be admissible. *See* Fed. R. Ev. 805; *Langbord v. U.S. Dept. of Treasury*, 2011 WL 2623315 (E.D.Pa. July 05, 2011) ("hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules"). The statements in CarFax vehicle history reports that may come into play in this case – the reporting of certified titles by Pennsylvania and Virginia DOTs – are (1) public records and reports (Fed. R. Ev. 803(8)) reported in (2) market reports and commercial publications (Fed. R. Ev. 803(17)).

At his deposition, Vince Luckey stated that CarFax, Inc. contracts with data sources that it believes to be generally reliable to receive their data records and load them directly into the Carfax vehicle history service database, which it then queries to produce the Carfax vehicle history reports. (Luckey dep. at p. 26). Many of those sources are Departments of Vehicles from the 50 states. (Luckey dep. at 30). Luckey reviewed the CarFax report dated June 29, 2011, that is attached as Exhibit "D" to the Complaint. Luckey testified that "those records where it states the source as Pennsylvania Motor Vehicle Department, those records would have been obtained from the Pennsylvania Department of Transportation." (*Id.* at 72). PennDOT's database is considered to be a public record. (*Id.* at 72). Luckey is unaware of any allegations of unreliability related to Pennsylvania's or Virginia's DOTs records. (*Id.* at 74). Indeed, the

information reflected in the June 29, 2011 CarFax report pulled by Sacks comports with those certified records maintained by PennDOT.  (See Exs. "F –I").  Thus, the statements in the subject CarFax reports are public records and not hearsay.

CarFax reports are also admissible as market reports or commercial publications, ie. (1) a list, directory or other published compilation, (2) generally used and relied upon by the public or by persons in the auto sales field.  Fed. R. Ev. 803(17); *see also Anousheh v. Planet Ford, Inc.*, 2007 WL 2482625, *10 (Ohio App. 2 Dist. Aug. 31, 2007) (affirming trial court's ruling to admit CarFax reports under 803(17) exception).  As discussed directly above, Mr. Luckey has testified to CarFax's nature as a compiler of records from, *inter alia*, public records such as PennDOT.  Moreover, CarFax's business is motivated by fostering reliance in users and subscribers and by being accurate.  *See* Notes of Advisory Committee to Fed. R. Ev. 803(17). CarFax is a "report widely used by automobile dealers." *Anousheh*, 2007 WL 2482625 at *10 (citation omitted).  *See also* Ex. "S", Luckey dep. at pp. 24-28 (explaining how CarFax tries to be as reliable as it reasonably can be and takes steps to insure reliability, such as attempting to correct inaccuracies and employing safeguards to maintain reliability).[7]

Indeed, Defendant DJA's website demonstrates its own heavy reliance on CarFax reports. DJA prominently displays the CarFax logo on the used cars it sells on its website.  (DJA website, http://www.kiaofwestchester.com/usedspecials.aspx, last visited Oct. 18, 2012).  Even on the CarFax website, CarFax refers to DJA as a "CarFax Advantage Dealer".  CarFax website, http://www.carfax.com/used_car_classifieds/dealer/inventory.cfx?dealer=496955, last visited Oct. 18, 2012).  Not only has DJA been a monthly CarFax subscriber since at least September 2004, it

---

[7]     Defendant's citation to *Jackson v. City of Pittsburgh*, 2011 WL 3443951 (W.D.Pa.  Aug. 8, 2011) is unavailing and provides no analysis.  There the pro se plaintiff failed to articulate any argument contra defendant's hearsay objection, let alone the complex legal argument that a statement meets a hearsay exception, or an exception within an exception.

pays a premium to be a "CarFax Advantage Dealer." "A Carfax Advantage Dealer is a dealer that subscribes to an unlimited reports package" and gets other "perks," such as advantages in pricing.  (Ex. "S" Luckey dep. at 41).  DJA's use of CarFax reports demonstrates its heavy reliance on the product – Mr. Luckey testified that Carfax, Inc.'s records indicated that Kia of West Chester ran 503 Carfax vehicle history reports in 2009 and 611 in 2010.  (*Id.* at 44).

Joe Spadaro, General Manager of Kia of West Chester testified about how DJA is a Carfax Advantage Dealer and considers CarFax to be useful in DJA's day to day operations in selling cars.  (See Ex. "U", Dep. of Joseph Spadaro, II, August 2, 2012 at p. 1-9).  When asked if he thought consumers rely on Carfax in making decisions to buy vehicles, Spadaro replied "I do. Not buy.  I think it helps them."  He went on to state:

> "You know, Carfax is a brilliant idea.  So anybody who's bought a pre-owned vehicle before you don't know the previous owner unless you knew the previous owner, but if you don't know the previous owner, you don't know the previous car.  So, you know, the genius behind Carfax says if I could develop a system, plug in the VIN number and I can show you some history on it, you know what you're buying.  So the perception of it all is that they can look at something, they can see a history, they know if it's had any problems. …"

(Id. at 6).  Defendant's own admissions and actions establish its own faith in the reliability of CarFax reports and estops its argument instantly.  Its argument to the contrary is nothing short of cynical.

The CarFax reports here are not offered only for the truth.  But even if they are, they meet hearsay exceptions as public records within market reports or commercial publications.

## C.  The Facts Support Plaintiff's Consumer Protection Law Claim

Pennsylvania's Consumer Protection Law bans an auto dealer from making a false or misleading representation to a buyer.  73 Pa. C.S. §201-2(4)(v, vii, xxi).  This is supplemented by Attorney General regulations which make it a violation of the UTPCPL for an auto dealer to

"[make] a representation or statement of a fact in an advertisement or sales presentation if the advertiser or salesperson knows or should know that the representation or statement is false and misleading or if the advertiser or salesperson does not have sufficient information upon which a reasonable belief in the truth of the representation could be based."  37 Pa. Code §301.2(6). Plaintiff's claim under the UTPCPL is premised on the same facts as his odometer act claims and much of the same facts set forth above apply here.  To wit, DJA made the false or misleading affirmative representations that, *inter alia*: the Optima had "low miles" of 33,609 when it did not, that there was no "odometer discrepancy" when there was, and that the delay in titling was the result of a mere "typo" when in reality PennDOT repeatedly rejected DJA's applications due to several higher-mileage titles in its own records.  DJA also deceptively omitted and suppressed material information from Sacks including: the existence of the negative title history, the fact of clear odometer discrepancy, and the repossession history.  DJA's misleading and obstructive conduct has continued well into this litigation, compounding its culpability.[8]

In its supplemental brief, DJA argues Plaintiff cannot prove a misrepresentation, intent or damages.  Misrepresentation and intent are adequately addressed above, and require no further comment here, except to point out that DJA's reliance on the unpublished case arising under Arizona law, *Auto Finance Specialists, Inc. v. ADESA Phoenix, LLC*, 2010 WL 1925491 (D.Ariz. May 11, 2010), is misplaced.  There, the court dismissed the commercial plaintiff's claim that failure to give a CarFax was a fraudulent omission.  *Id.* at *3-4.   By contrast, the negative title history is the material omission here, which DJA knowingly hid from Sacks.  The testimony about the negative CarFax reports DJA pulled on December 9, 2008 and January 7,

---

[8]      Plaintiff has sought leave to amend his complaint to bring a claim for common law fraud.  (Doc. No. 18).

2009 are simply probative evidence of the omission, suppression, knowledge and intent to deceive Sacks into buying the Optima.

As for damages, Plaintiff seeks rescission of the purchase and financing ($11,088.96) premised on defendant's fraud, as provided for by the UTPCPL. *See Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa. Super. Ct. 1998)(allowing rescission of purchase price, trebled, under UTPCPL).    According to Plaintiff's expert Mr. Diklich there is diminution in value on the Optima and other losses suffered as a result of DJA's conduct.  (See Ex. "X", Diklich expert report at p. 4).  It is the vehicle's haunted history – which is reflected in CarFax and AutoCheck reports – that results in the diminution.  (Id.).  These damages exist whether or not Plaintiff can prove a rollback in fact, and stem from Defendant's misrepresentations and omissions about the discrepant title history of the Optima.  Defense expert Mr. Allen's conclusion of no diminution strains credulity and is not a basis for summary judgment. *See F.P. Woll*, 1999 WL 79059 at 7. All things being equal, any reasonable consumer would choose a car with no negative title history over an identical car with a title history reflecting rollback, whether accurate or not.  Had Sacks known about the negative title history, he would never have bought the car.  (See Ex. "T", Sacks Cert. at ¶5).  He seeks rescission and refund, with statutory damages.  Defendant's motion for summary judgment on the UTPCPL claim should be dismissed.

**D.  Breach of Warranty**

Plaintiff relies on the above argument and refers the Court to his opening opposition brief (Doc. No. 10) to oppose summary judgment on the breach of warranty claim.  Put simply, DJA warranted a "low mileage," "certified," problem free car, but delivered high mileage vehicle with a troubled title history.

**E. Defendant Waived its Right to Arbitrate**

Plaintiff incorporates those waiver arguments articulated in his opening brief. (Doc. No. 10). He adds only that since the filing of that brief on June 4, 2012, DJA has engaged in the following conduct inconsistent with the intent to arbitrate:

- Filing a Reply in support of its motion for summary judgment (Doc. No. 12);

- Filing an Emergency Motion to Quash the CarFax subpoena (Doc. No. 13);

- Seeking and participating in a phone conference with the Court re the motion to quash;

- Participating and asking questions in the depositions of:
  - Vincent Luckey of CarFax, Inc.
  - Karen Halloran
  - Joe Spardaro
  - Jennifer Mimm; and
  - Thomas Walsh

- Entering a scheduling stipulation approved by the Court (Doc. No. 17);

- Entering an amended scheduling stipulation approved by the Court (Doc. No. 20) and abiding the deadlines set forth therein;

- Filing opposition to plaintiff's motion for leave to amend complaint (Doc. No. 19); and

- Filing the instant Supplemental Brief in Support of Summary Judgment (Doc. No. 24).

In light of these facts, most glaringly that Defendant has repeatedly availed itself of Court process through the instant motion, the *Hoxworth* factors heavily demonstrate waiver in this case. DJA's position on arbitration instantly is the litigant's equivalent of the old adage "heads I win [summary judgment granted], tails you lose [case dismissed to arbitration]." *Hooper v.*

25

*Advance Am.*, 589 F.3d 917, 922 (8th Cir. 2009).   Courts do not permit a party to play so fast and loose with their position or the Court's resources.

## IV.   **CONCLUSION**

For all the foregoing reasons, and those set forth in Plaintiff's opening brief opposing summary judgment (Doc. No. 10); Defendant DJA's motion for summary judgment should be denied in its entirety and this matter set for trial forthwith.

Respectfully submitted:

DATE:  10/19/12

/s/ Andrew M. Milz
CARY L. FLITTER
THEODORE E. LORENZ
ANDREW M. MILZ
Attorney for Plaintiff

FLITTER LORENZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
610-822-0782

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| C. DOV SACKS<br><br>     Plaintiff,<br><br>  vs.<br><br>DJA AUTOMOTIVE LLC d/b/a<br>KIA OF WEST CHESTER<br>     Defendant. | CIVIL ACTION<br><br><br><br><br><br>NO.   12-284(TON) |

## CERTIFICATE OF SERVICE

  I, ANDREW M. MILZ, do hereby certify that a copy of the foregoing Plaintiff's Supplemental Response in Opposition to Defendant DJA Automotive LLC d/b/a/ Kia of West Chester's Motion for Summary Judgment was served upon the below listed counsel by electronic filing:

Lindsay D. Liebman, Esquire
RAWLE & HENDERSON, LLP
The Widener Building
One South Penn Square
Philadelphia, PA 19107
**Attorney for Defendant**

Date:  10/19/12        */s/ Andrew M. Milz*
               ANDREW M. MILZ